PEOPLE FOR ENVIRONMENTAL EN-
LIGHTENMENT AND RESPONSIBILI-
TY (PEER), INC., et al., petitioners, Ap-
pellants,

v.

MINNESOTA ENVIRONMENTAL
QUALITY COUNCIL, etc.,
Respondent,

Northern States Power Company,
Respondent.

No. 47911.

Supreme Court of Minnesota.

April 7, 1978.

Rehearing Denied May 10, 1978.

Peter S. Popovich, St. Paul, Broeker, Hartfeldt, Hedges & Grant, Will Hartfeldt, and Eleni P. Skevas, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Stephen Shakman, William E. Dorigan and Donald A. Kannas, Sp. Asst. Attys. Gen., St. Paul, for Mn. Env. Qual. Council.

Ralph S. Towler, Minneapolis, for No. St. Power.

Popham, Haik, Schnobrich, Kaufman & Doty, Raymond A. Haik, and Gary R. Macomber, Minneapolis, for NSP & Mn. Power & Light.

SHERAN, Chief Justice.

This appeal was taken from a district court judgment affirming the issuance by respondent Minnesota Environmental Quality Council (MEQC)[1] of a construction permit for a high voltage transmission line (HVTL) between the Twin Cities' metropolitan area and Forbes, Minnesota, pursuant to its authority under the Power Plant Siting Act (PPSA), Minn.St. 116C.51 to 116C.69, and rejecting appellants' challenge to a 5½-mile segment of the proposed route from node 2 to node 8A in Washington County known as Route 7. We remand to the district court to refer the case to the

---

1. When created by statute in 1973, the agency was named the Minnesota Environmental Quality Council. L.1973, c. 342, § 3. In 1975 the legislature changed its name to the Minnesota Environmental Quality Board. L.1975, c. 271, § 3(7). The briefs refer to the agency by its original name, its title when the administrative hearings were held, and we will do likewise in this opinion.

The legislature created the MEQC because "problems related to the environment often encompass the responsibilities of several state agencies and * * * solutions to these environmental problems require the interaction of these agencies." Minn.St. 116C.01. Consequently, its membership includes the directors of the State Planning Agency, the Pollution Control Agency, and the Energy Agency; the commissioners of Natural Resources, Agriculture, Transportation and Health; a representative of the governor's office; and four members of the Citizens Advisory Committee. Minn.St. 116C.03.

MEQC for further proceedings consistent with this opinion.

Appellants are a number of individuals and a nonprofit corporation of approximately 65 members, most of whom live on or adjacent to proposed Route 7. At the time it intervened in the administrative proceeding,[2] People for Environmental Enlightenment and Responsibility (PEER) was an unincorporated association of approximately 35 members, all of whom would be affected by the existence of an HVTL on proposed Route 7. Prior to its appeal to the district court, PEER became a nonprofit corporation with a membership of 65 whose purposes included protection of the Washington County environment from the proliferation of powerline routes.

Respondents in this action include the MEQC, which issued the construction permit, and Northern States Power Company (NSP) and Minnesota Power & Light Company (MP&L),[3] two Minnesota corporations. NSP and MP&L are investor-owned utilities. They jointly sought permission from the MEQC to construct this HVTL, and they will share in the ownership and responsibility for it and associated facilities.

On January 20, 1975, pursuant to § 116C.57, NSP and MP&L jointly applied to the MEQC for a corridor designation and a certificate of corridor compatability for a single-circuit 500–kV HVTL from just south of Cromwell, in Carlton County, to a proposed substation in Chisago County and for a double-circuit 345–kV HVTL from the Chisago City substation to the Twin Cities' metropolitan area. The entire project planned by the applicants is greater than the requested HVTL and envisions the eventual construction of an HVTL system north to the Canadian border. The purpose of the larger project is to permit the sale of electricity between Manitoba Hydro, a Canadian utility, and NSP and between MP&L and NSP. The MEQC appointed a hearing examiner who held four public hearings on the application, and on July 18, 1975, it accepted his findings of fact, conclusions and recommendations and issued a certificate of corridor compatability.

On February 10, 1976, pursuant to § 116C.57, subd. 2, the MEQC received an application from NSP and MP&L for the selection of a specific route within the designated corridor and for the issuance of a construction permit. The MEQC then established a Citizen's Route Evaluation Committee and ordered its Power Plant Siting Staff to prepare a draft environmental impact statement (EIS).

In the southern portion of the corridor in which the 345–kV HVTL was to be constructed, the applicants expressed their preference for Route 3 and also suggested four alternative segments. They favored Route 3 because it contained an existing HVTL, on the theory that it is less environmentally damaging to construct transmission lines in close proximity than to spread them out over the entire landscape.

On the basis of their application, a draft EIS was written sometime prior to April 2, 1976. The review period for this draft was between April 2, 1976, and May 17, 1976, after which the EIS was evaluated in light of whatever citizen input had occurred. On June 10, 1976, the final EIS was sent to the MEQC.

Simultaneously with the drafting and review of the EIS, the Citizen's Route Evaluation Committee held hearings on proposed routes. On April 13, 1976, it reported to the MEQC and recommended the addition of Routes 6 and 7 for consideration at the public hearings to be conducted by the hearing examiner, William Seltzer. The MEQC added Route 7 to the five proposed

2. PEER claimed in its pleading in intervention that it was intervening pursuant to Minn.St. 116B.09, which permits natural persons and associations to intervene as a matter of right in a permit proceeding upon the filing of a verified pleading.

3. The respondents in the original appeal were only the MEQC and NSP. MP&L sought, and was granted, permission to intervene.

by the utilities. The additional route, however, was not evaluated in the draft EIS.[4]

The public hearings on the candidate routes began on April 15, 1976. Six hearings were held in the 4 counties that would be affected by the double-circuit 345–kV HVTL. It quickly became apparent that three routes—Route 1, the freeway route; Route 3, the 230–kV route; and Route 7, the airport route—were the most viable alternatives, and the majority of the evidence submitted concerned them. Route 3 was the route preferred by the utilities and by PEER, the Siting Staff of the MEQC recommended Route 7, while the Citizen's Route Evaluation Committee made a split recommendation in which both Route 1 and Route 7 received 5 first-preference votes. The record of the public hearings was closed on June 23, 1976, and on July 12, 1976, the hearing examiner submitted his findings of fact, conclusions and recommendations. After stressing the subjective nature of the route-evaluation process and the need to balance "the interests of those directly impacted, the interest of the body politic in the protection and preservation of the environment and other natural resources, the efficient use of resources while * * * insuring that electric energy needs are met and fulfilled in an orderly and timely fashion," all of which was adopted verbatim by the MEQC,[5] the hearing examiner recommended the selection of Route 7 rather than the existing powerline corridor known as Route 3 or the existing powerline and transportation corridor known as Route 1.

On August 4, 1976, PEER served each MEQC member with a pleading in intervention alleging that construction of the proposed HVTL along Route 7 would impair, pollute, and destroy Long Lake, a 49-acre lake that is used by persons for recreation and by wild ducks and other waterfowl as a natural flyway and brood area, as well as a 130-acre virgin oak woods containing some trees thought to be over 100 years old, both of which are natural resources protected by the Minnesota Environmental Rights Act (MERA), Minn.St. c. 116B. At its meeting of the same date, the MEQC permitted representatives of citizens groups to give limited testimony concerning the routes under consideration. Although Messrs. Herbst, Marzitelli, and Ohman expressed their concern over the proliferation of routes which would result from the MEQC's acceptance of the hearing examiner's recommendation and suggested that such proliferation was inconsistent with long-term land use planning, the MEQC voted 7 to 3 to adopt the hearing examiner's report.

On October 1, 1976, PEER appealed the MEQC decision to district court pursuant to Minn.St. 116B.09, subd. 3, and 116C.65, alleging the same impairment, pollution, and destruction of natural resources that it had delineated in its pleading in intervention. After receiving written briefs and hearing oral arguments, the court affirmed the MEQC decision to permit construction along Route 7 on the following grounds:

(1) That substantial evidence supported the selection of Route 7 over Route 3 and Route 1;

**4.** Even the final EIS did not provide sufficient information on Route 7 to permit the decision-maker to make an informed choice. See, § 4, *infra.*

**5.** Except in the section concerning the specifics of the construction permit, to which the MEQC added nine paragraphs, no substantive differences exist between the findings of fact, conclusions and recommendations of the hearing examiner and those of the MEQC. PEER attempted to discover whether the members of the MEQC had read that report or the final EIS. It sent first requests for admission and then interrogatories to MEQC members asking whether they had read the EIS, the other exhibits, or the hearing examiner's transcripts of testimony. MEQC members refused to answer the interrogatories on the grounds that they were not relevant to any issues under consideration, that they sought to discover privileged matters, and that it was contrary to the public interest to probe the deliberative process of members of an administrative agency acting in a quasi-judicial capacity. Since the district court held that the MEQC decision was supported by substantial evidence, it did not find it necessary to discuss PEER's allegation. But see, § 9, *infra.*

(2) That the effect of the HVTL on human settlement was not an improper criterion and was not overly weighted;

(3) That the findings of fact were sufficiently specific to permit judicial review;

(4) That the alleged procedural errors were either not demonstrated or not prejudicial;

(5) That it was unnecessary to inquire into the individual mental processes of the members of the MEQC; and

(6) That the balancing of social policies required by the PPSA was consistent with both MERA and the Environmental Policy Act (MEPA), Minn.St. c. 116D. It is from this judgment that PEER appeals.

After carefully considering the arguments of counsel and the reasoning advanced by the district court, we are of the opinion that the MEQC erred in its handling of the contested portion of route-selection process. For the reasons delineated below, we reverse in part, modify in part, and remand. Specifically, we hold as follows:

■ (1) Administrative decisions on the routing of HVTLs are subject to MERA as well as to other applicable environmental legislation.

■ (2) An HVTL routing that impairs, pollutes, or destroys protected natural resources cannot be approved if there is a prudent and feasible alternative route available.

■ (a) Constructing the HVTL along Route 7 will impair, pollute, or destroy the lake and the woods which are protected natural resources. Because no detailed findings were made by the hearing officer regarding the degree of impairment, pollution, or destruction, we cannot accurately assess the impact of Route 7 on these protected natural resources. In the absence of such findings, we must assume that the intrusion is substantial.

■ (b) Route 3 is an available, prudent, and feasible alternative to Route 7. Because Minnesota is committed to the principle of nonproliferation, the existence of a powerline along Route 3 would ordinarily have compelled the MEQC to choose Route 3 over Route 7. The fact that the utilization of Route 3 would require the condemnation of a number of homes is not, in and of itself, sufficient to overcome the law's preference for containment of powerlines.

■ (3) The balancing process mandated by the PPSA should only be utilized after more than one form of noncompensable intrusion has been identified.

(a) There is no evidence that the taking of some homes will create noncompensable loss within the meaning of "human impact" intended by the legislature. Nothing in the record before us supports the conclusion that the structures that will be condemned if Route 3 is utilized have unique characteristics which would make it difficult or impossible to assess adequately the damages to be paid for their taking. In the event of condemnation, there is no evidence that the homeowners could not acquire other equivalent accommodations. Many houses in the vicinity of Route 3 were built there after the powerline now in place was constructed which suggests that its presence was not unacceptably offensive to the residents. Therefore, were the case to be decided on the present record, the MEQC would be required, as a matter of law, to select Route 3.

■ (b) We feel, however, that it would be unfair for us to make this decision on the basis of the present record. We believe that it would be more equitable to give the residents along Route 3 an opportunity to demonstrate the unique characteristics of their homes for which money damages would not be adequate compensation. Therefore, a period of 30 days from the date of the district court's remand to the MEQC will be permitted for testimony of this kind to be presented to the agency. Only if the affected residents are able to sustain their burden of demonstrating the noncompensable nature of their homes will the MEQC have to balance the impact of Route 3 upon "human settlement" against the impact of Route 7 on protected natural

resources. Otherwise, the MEQC will be required, as a matter of law, to select Route 3.

■ (4) Under MEPA, an EIS must be available to guide the agency in its selection of a specific route. Although an EIS was prepared in this case, it did not provide the detailed information on all the routes that is necessary for it to serve its proper function in the decisionmaking process. Thus, if the MEQC decides that the evidence introduced on remand requires it to balance Route 3 against Route 7, it will not be able to do so until the EIS is sufficiently revised to permit it to be useful in the selection decision.

(5) As should be clear from the above, we do not believe that the findings of fact of the hearing examiner and the agency were sufficiently specific to permit judicial review.

(6) The district court erred in not permitting appellants to discover whether agency members had complied with their statutory duties.

1. *The Applicability of MERA.* MERA, c. 116B, which was passed by the legislature in 1971, was the first piece of environmental legislation in Minnesota. Its purpose, as stated in § 116B.01, reads as follows:

"The legislature finds and declares that each person is entitled by right to the protection, preservation, and enhancement of air, water, land, and other natural resources located within the state and that each person has the responsibility to contribute to the protection, preservation, and enhancement thereof. The legislature further declares its policy to create and maintain within the state conditions under which man and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed. Accordingly, it is in the public interest to provide an adequate civil remedy to protect air, water, land and other natural resources located within the state from pollution, impairment, or destruction."

In 1973, the legislature enacted three other pieces of environmental legislation to complement MERA: (1) Section 116C.01, which created the MEQC to provide the interagency interaction necessary for the solution of complex environmental problems; (2) MEPA, c. 116D, which required all state agencies to consider environmental factors before making decisions that potentially have significant environmental effects; and (3) the PPSA, §§ 116C.51 to 116C.69, which, according to § 116C.55, subd. 1, would ensure the "sit[ing of] large electric power facilities in an orderly manner compatible with environmental preservation and the efficient use of resources."

■ Although the focus of each of these statutes is slightly different, together they are part of a coherent legislative policy, one of whose aims is to harmonize the need for electric power with the equally important goal of environmental protection. Recognizing that the MEQC constituted the best pool of environmentally skilled personnel, the legislature chose it to administer the PPSA. To ensure that the MEQC would not sacrifice environmental protection in its attempt to site power plants and HVTLs as efficiently as possible, it required that "to the fullest extent practicable the policies, regulations and public laws of the state shall be interpreted and administered in accordance with the policies set forth in [MEPA]." Section 116D.03. And, if the MEQC failed to comply with the mandates of MEPA and the PPSA, MERA existed to permit private citizens to bring a civil action to compel the agency to consider environmental factors. Recently, in *No Power Line, Inc. v. Minnesota EQC,* Minn., 262 N.W.2d 312, 323 (1977), we decided that the legislature did not intend the PPSA to preempt MEPA and make it superfluous. Today we reach a similar conclusion regarding MERA. Rather than intending the PPSA to supersede MERA, the legislature passed all these statutes to ensure that administrative agencies would discharge fully their environmental responsibilities.

This conclusion is consistent with the general policy of statutory construction followed by this court of harmonizing statutes dealing with the same subject matter. *Lenz v. Coon Creek Watershed District*, 278 Minn. 1, 11, 153 N.W.2d 209, 217 (1967); *State ex rel. Carlton v. Weed*, 208 Minn. 342, 344, 294 N.W. 370, 371 (1940). We also presume that, in enacting a statute, the legislature acted with full knowledge of prior legislation on the same subject. *Erickson v. Sunset Memorial Park Assn.*, 259 Minn. 532, 543, 108 N.W.2d 434, 441 (1961); *Minneapolis Eastern Railway Co. v. City of Minneapolis*, 247 Minn. 413, 418, 77 N.W.2d 425, 428 (1956). The legislature, being aware of the existence of MERA when it passed the PPSA, cannot be assumed to have exempted PPSA proceedings from having to comply with MERA without express statutory language to that effect. Since such language is absent, the legislature must have intended to permit private citizens to bring or intervene in civil actions to protect the state's natural resources whenever they think the MEQC has not done so adequately.[6]

Following the lead of Michigan,[7] see, e. g., *Michigan State Highway Comm. v. Vanderkloot*, 392 Mich. 159, 220 N.W.2d 416 (1974); *Ray v. Mason County Drain Commissioner*, 393 Mich. 294, 224 N.W.2d 883

(1975), this court has recognized that MERA provides not only a procedural cause of action for protection of the state's natural resources, but also delineates the substantive environmental rights, duties, and functions of those subject to the Act. *County of Freeborn v. Bryson*, 309 Minn. 178, 243 N.W.2d 316 (1976); *Corwine v. Crow Wing County*, 309 Minn. 345, 244 N.W.2d 482 (1976); *MPIRG v. White Bear Rod & Gun Club*, Minn., 257 N.W.2d 762 (1977). Although respondents would limit this substantive cause of action to those situations in which no other environmental legislation exists,[8] their reasons for doing so are not persuasive. MERA is clearly broader than the PPSA because MERA recognizes a right in *each citizen* to bring a civil suit, while under § 116C.65 of the PPSA, only a utility, a party, or a person aggrieved can appeal a decision of the MEQC to the district court. Furthermore, respondents have not demonstrated any reason to so limit MERA in the absence of express legislative direction. The need for citizen vigilance exists whether or not specific environmental legislation applies, and MERA is clearly a proper mechanism to force an administrative agency, even the MEQC, to consider environmental values that it might have overlooked.[9]

---

6. This conclusion is supported by another principle of statutory construction—that " 'a statute adopted from another state * * * is presumed to have been taken with the construction there placed upon it.' " *Hunt v. Nevada State Bank*, 285 Minn. 77, 98, 172 N.W.2d 292, 305 (1969), certiorari denied sub nom. *Burke v. Hunt*, 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970), (quoting *Teague v. Damascus*, 183 F.Supp. 446, 448 [E.D.Wash.1960]). Professor Sax, author of the first draft of the Michigan act upon which MERA is based, noted that the Michigan act "was designed to reduce the range of discretion traditionally given to regulatory agencies and to enable citizens to challenge standards established by those agencies." Sax & Connor, *Michigan's Environmental Protection Act of 1970: A Progress Report*, 70 Mich.L.Rev. 1004, 1064. This suggests that MERA, rather than being preempted by the PPSA, was seen by the legislature as an important mechanism which could be used by citizens to force an administrative agency to protect the state's natural resources. See, Haynes, *Michigan's Environmental Protection*

*Act in its Sixth Year: Substantive Environmental Law from Citizen Suits*, 53 J.Urban L. 589, 610.

7. Michigan was the first state to enact a statute like MERA, and Minnesota's statute is modeled after it.

8. Since the administrative action attacked by PEER was taken pursuant to the PPSA, which not only includes environmental values in its balancing process but also provides an avenue of judicial review pursuant to § 116C.65, respondents contend that MERA has no independent role to play here.

9. This interpretation is also consistent with that taken by the Michigan courts. In an unreported decision in which the plaintiff challenged the Michigan Department of Natural Resources' grant of a permit for the construction of a dam under the Dam Act, which had become effective subsequent to its Environmental Protection Act, the court held that a citizen could maintain an action to ensure that

2. *The Methodology of MERA.* The principal provision of MERA that is of relevance here is § 116B.04,[10] which establishes the burdens of proof of the contending parties. It reads in pertinent part as follows:

" * * * [W]henever the plaintiff shall have made a prima facie showing that the conduct of the defendant has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. *The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative* and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not constitute a defense hereunder." (Italics supplied.)

As we interpreted this section in *County of Freeborn v. Bryson,* 297 Minn. 218, 228, 210 N.W.2d 290, 297 (1973), in order to make "a prima facie showing" the plaintiff must prove the existence of "(1)[a] protectible natural resource, and (2) pollution, impairment or destruction of that resource." PEER alleged that Route 7 would impair,

pollute, and destroy both a 130-acre virgin oak woods and Long Lake.[11] The virgin oak, whose existence was brought to the attention of the hearing officer, is a protectible natural resource, and all parties conceded that the construction of the HVTL would impair it.[12] No mention is made of Long Lake in the administrative proceedings, but its existence was asserted in PEER's complaint and arguments to the district court and was recognized in the MEQC's brief to this court. Because the district court found the provisions of MERA inapplicable to the proceeding and decided the appeal solely under the review provisions of the PPSA, however, it did not permit PEER to introduce evidence to support its allegations of impairment. Therefore, we must assume that the intrusion on Long Lake is substantial and that PEER sustained its initial burden under § 116B.04.

▮ Once a person or a group has made a prima facie showing that an agency's action or inaction will materially adversely affect protectible natural resources, before it can take that action, the agency must either rebut plaintiff's prima facie case or demonstrate as an affirmative defense that no feasible and prudent alternative exists and that its conduct will promote the public health, safety, or welfare. *MPIRG v. White Bear Rod & Gun Club,* Minn., 257 N.W.2d 762, 769. Since, by definition, the

---

regulatory agency decisions were environmentally defensible on their merits. Sax & Connor, *Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich.L.Rev. 1004, 1061. Since "[l]aws uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them," *Hunt v. Nevada State Bank,* 285 Minn. 77, 98, 172 N.W.2d 292, 305, certiorari denied sub nom. *Burke v. Hunt,* 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (quoting Minn.St. 645.22), a citizen in Minnesota should be permitted to maintain a civil action against the MEQC under MERA.

10. PEER also stressed the importance of § 116B.09, which governs intervention in an administrative proceeding. It is unnecessary for us to decide whether the MEQC's refusal to accept PEER's petition in intervention violated MERA because it appears from the transcript

of the route-selection hearings that members of PEER participated in those hearings as individuals.

11. As delineated in § 116B.02, subd. 4, natural resources include "all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources." In *Corwine v. Crow Wing County,* 309 Minn. 345, 361, note 3, 244 N.W.2d 482, 490 (1976), this court recognized that a lake is a protectible natural resource under c. 116B.

12. In its brief, the MEQC conceded that the construction of a HVTL would cause environmental damage wherever it were located. This was also recognized by the drafters of the PPSA. Section 116C.55, subd. 1, states that the MEQC "shall choose sites that *minimize* adverse human and environmental impact * * *." (Italics supplied.)

siting of HVTLs will cause some impairment of the environment, the MEQC's selection of Route 7 would only comply with MERA if no prudent and feasible alternatives to Route 7 existed.[13]

As interpreted by this court, the prudent and feasible alternative standard is analogous to the principle of nonproliferation in land use planning. In *County of Freeborn v. Bryson,* 309 Minn. 178, 188, 243 N.W.2d 316, 321, we noted that although the state's past encouragement of highway construction resulted in the elimination or impairment of natural resources, "remaining resources will not be destroyed so indiscriminately because the law has been drastically changed by [MERA]." Similarly, in *Reserve Mining Co. v. Herbst,* Minn., 256 N.W.2d 808, 827 (1977), we recognized the state's "strongly held commitment * * * to protecting the air, water, wildlife, and forests from further impairment and encroachment," which supported our choice of Mile Post 7 over Mile Post 20, (256 N.W.2d 832). The court had no trouble deciding that the Department of Natural Resources, which, like the MEQC, had a statutory duty to protect the environment, had failed to comply with this policy of nonproliferation in choosing between the alternative sites. See, also, *No Power Line, Inc. v. Minnesota EQC,* Minn., 262 N.W.2d 312, 331 (Yetka, J., concurring specially).

This policy of nonproliferation is also supported by legislative enactments. Minn. Reg. MEQC 74(d)(3)(ee), adopted pursuant to authority granted to the MEQC under the PPSA, requires the decisionmaker to consider as one factor in the selection process whether the proposed route will "maximize utilization of existing and proposed rights-of-way." The legislature explicitly expressed its commitment to the principle of nonproliferation in its 1977 revision of the PPSA. The MEQC is now required to consider the utilization of existing railroad and highway rights-of-way and the construction of structures capable of expansion in capacity through multiple circuiting in making its selection from among alternative HVTL routes. L.1977, c. 439, § 10.

■■■ We therefore conclude that in order to make the route-selection process comport with Minnesota's commitment to the principle of nonproliferation, the MEQC must, as a matter of law, choose a pre-existing route unless there are extremely strong reasons not to do so. We reach this conclusion partly because the utilization of a pre-existing route minimizes the impact of the new intrusion by limiting its effects to those who are already accustomed to living with an existing route. More importantly, however, the establishment of a new route today means that in the future, when the principle of nonproliferation is properly applied, residents living along this newly established route may have to suffer the burden of additional powerline easements.

■■■ Minn.Reg. MEQC 74(d),[14] the regulation which implements the PPSA and pro-

---

13. Although the trial court found that MERA and the PPSA were compatible and held that there was substantial evidence to support the MEQC's choice of Route 7, as we stated in *Reserve Mining Company v. Herbst,* Minn., 256 N.W.2d 808, 824 (1977), and reiterated in *No Power Line, Inc. v. Minnesota EQC,* Minn., 262 N.W.2d 312, 320: " * * * [i]t is our function to make an independent examination of an administrative agency's record and decision and arrive at our own conclusions as to the propriety of that determination without according any special deference to the same review conducted by the trial court." Thus, it is necessary for the court to itself determine whether the agency's selection of Route 7 is legally supportable.

14. Minn.Reg. MEQC 74(d) provides for HVTL corridor and route selection as follows: "(d)

Criteria for HVTL Corridor Selection. The following criteria and standards shall be used by the Council in the preparation of an inventory of HVTL corridors and to guide the Council in the evaluation and selection of HVTL routes.

"(1) Exclusion Criteria.

"(aa) No HVTL shall be routed in violation of any federal or state agency regulations.

"(bb) No HVTL shall be routed through national wilderness areas, state wilderness areas or through any area designated a HVTL exclusion area by the Council.

"(2) Transmission Line Avoidance Areas. In addition to exclusion areas, the following land use areas shall not be approved for HVTL routes when feasible and prudent alternatives with lesser adverse human and environmental effects exist. Economic considerations alone shall not justify approval of avoidance areas.

vides guidelines to be followed in the route-selection process, however, does not adequately reflect this concern with the principle of nonproliferation.[15] The prudent and feasible alternative standard is applied only to avoidance areas, Minn.Reg. MEQC 74(d)(2), and, by failing to weigh the 12 factors to be balanced when dealing with land that is to be neither excluded nor avoided, Minn.Reg. MEQC 74(d)(3), the MEQC has made it possible for environmental considerations to be balanced out of the equation entirely.

In fact, this is precisely what appears to have occurred in the proceedings being challenged in this appeal. Residents along Route 3 introduced no evidence that

its utilization would impair or destroy the environment; rather, they argued that the choice of Route 7 was preferable because it would require the condemnation of fewer homes than would the selection of Route 3. Although the hearing examiner, the MEQC, and the district court all accepted both their reasoning and their conclusion, condemnation of a number of homes does not, without more, overcome the law's preference for containment of powerlines as expressed in the policy of nonproliferation. Persons who lose their homes can be fully compensated in damages. The destruction of protectible environmental resources, however, is noncompensable and injurious to all present and future residents of Minnesota.[16]

Any approval of such areas shall include all possible planning to minimize harm to these areas. HVTL avoidance areas are: national parks; national historic sites and districts and natural landmarks; national monuments; national wildlife refuge areas; national wild, scenic, and recreational riverways; state wild, scenic, and recreational rivers and their land use districts; state parks; state registered historic sites; state historic districts; Nature Conservancy preserves; state scientific and natural areas; county parks; metropolitan parks; designated state and federal recreational trails; designated state canoe and boating routes; and any other area designated a transmission line avoidance area by the Council.

"(3) Selection Criteria. The following criteria shall be applied in the selection of corridors:

"(aa) Preferred corridors and routes minimize disruption to existing urbanized land uses and human settlement.

"(bb) Preferred corridors and routes minimize disruption to existing and potential irrigated and non-irrigated agricultural land uses.

"(cc) Preferred corridors and routes minimize disruption to recreational and historical land uses.

"(dd) Preferred corridors and routes minimize disruption to natural systems including vegetation, wildlife, and water.

"(ee) Preferred corridors and routes maximize utilization of existing and proposed rights-of-way.

"(ff) Preferred corridors and routes minimize visual impact on urbanized land, recreational land and water, and transportation corridors.

"(gg) Preferred corridors and routes optimize cost of materials, labor, right-of-way acquisition, project schedules, and maintenance.

"(hh) Preferred corridors and routes minimize disruption to existing and potential forestry land uses.

"(ii) Preferred corridors and routes minimize impact upon projected human settlement.

"(jj) Preferred corridors and routes maximize reliability with respect to climate, soils, geology, and vandalism.

"(kk) Preferred corridors and routes maximize accessibility.

"(ll) Preferred corridors and routes minimize disruption to existing and potential extractive and storage resources."

15. Respondents contend that the MEQC has satisfied the requirements of MERA by including the prudent-and-feasible-alternative standard in its regulations adopted pursuant to authority granted it by the legislature under the PPSA, Minn.St. 116C.66. The adoption of this standard, however, is only partial, and, although the district court accepted their argument, it does not accord with the legislative intent.

16. In MERA, the legislature stated "its policy to create and maintain within the state conditions under which man and nature can exist in productive harmony in order that present and future generations may enjoy * * * [the] natural resources with which this state has been endowed." Section 116B.01. This philosophy is also reflected in MEPA, § 116D.02, and in the PPSA which was enacted partly to ensure that the siting of HVTLs caused minimal damage to the environment which belongs to all the state's citizens, § 116C.55, subd. 1. The encouragement of citizen suits to protect the environment from impairment or pollution reflects the legislature's conviction that while individuals will be vigilant in their attempts to prevent the destruction of their homes and private property, since the environment belongs to no one, no one will protect it unless private attorneys-general are permitted to sue on behalf of the public interest.

Any other result would be contrary to *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136, 150 (1971), in which the United States Supreme Court rejected such wide ranging balancing of compensable with noncompensable impairment. In order to protect natural resources to the fullest extent possible, the court required that truly extraordinary disruption be demonstrated before a prudent and feasible alternative to an environmentally destructive action would be refused. Ibid. Since the taking of seven or eight homes is not extraordinary disruption, it cannot be used to justify the proliferation of HVTLs and the destruction of protectible natural resources. Thus, the MEQC erred in choosing Route 7 over Route 3 on the basis of the evidence before it.

■ 3. *The Utilization of Balancing under the PPSA.* Section 116C.55 of the PPSA requires the MEQC to balance three separate criteria—human impact, environmental impact, and reliability and cost of electric power—in making HVTL routing decisions. Although the MEQC has interpreted this section to mandate balancing whenever no exclusion or avoidance areas are involved, Minn.Reg. MEQC 74(d)(3), such a position does not comport with MERA, which permits balancing only when one potential route will cause greater environmental and another greater human noncompensable damage. Therefore, the "human impact" discussed in the PPSA must refer to noncompensable impairment of human resources.[17]

Applying this standard to the facts before us, homeowners can argue against HVTL routes that will impair their residence only if they can demonstrate unique irreplaceable characteristics of their homes not reflected in market value which would make their taking noncompensable. Thus, for example, if a home were crafted in an unusual manner or constructed of rare materials, to the extent that such factors are not reflected in market value, its taking could be noncompensable. Similarly, the establishment of some noncorporeal aspect of home ownership, such as proximity to a unique school system which could not be reproduced or converted to market value, could make the owner's interest in the property noncompensable. Although the owners along Route 3 introduced a great deal of evidence about the pleasant nature of their neighborhood, no testimony was presented on the possible noncompensable aspects of their residences. Weighing against them, moreover, are the presence of an HVTL along Route 3 and the fact that most persons bought or built their homes after it had been constructed.

■ An examination of the evidence now in the record compels the conclusion that Route 7 causes noncompensable damage and Route 3 only compensable damage,[18] making balancing under Minn.Reg. MEQC 74(d)(3) improper. Thus, we would be justified in reversing and designating Route 3. This, however, might be unfair to the residents along Route 3 who would not then have an opportunity to be heard on the human impact of choosing Route 3 under the standard we now enunciate. For these reasons, we believe that it is more equitable to remand the case to the MEQC to permit the affected homeowners along Route 3 to introduce evidence of noncompensable damage to affected property interests.

---

17. Translated into practical terms, this means that Minn.Reg. MEQC 74(d) can only be sustained if the prudent and feasible alternative standard applies to the entire selection process. Thus, the balancing of the 12 factors delineated in Minn.Reg. MEQC 74(d)(3) only comes into play after the MEQC has found no prudent and feasible alternative to an environmentally damaging route.

18. Route 1 was eliminated because it included an avoidance area and Routes 3 and 7 were found to be prudent and feasible alternatives. See, Minn.Reg. MEQC 74(d)(2). Had the agency been acting in compliance with the nonproliferation principle, however, Route 7 would not have even been considered, since both Route 1 and Route 3 were existing rights-of-way. Because Route 1 traversed an avoidance area, however, Route 3 should have been chosen as a prudent and feasible alternative to Route 1.

4. *The Preparation of the EIS.* In its appeal to the district court, PEER alleged that the EIS was defective because it did not include an analysis of Route 7. Although PEER did not pursue this allegation of irregularity on appeal to this court, it is a very serious infraction, if true, and is clearly within the scope of our review as contemplated by Rule 103.04, Rules of Civil Appellate Procedure. See, also, *Witzig v. Philips,* 274 Minn. 406, 410, 144 N.W.2d 266, 269 (1966).

█ As this court recognized in *No Power Line, Inc. v. Minnesota EQC,* Minn., 262 N.W.2d 312, 325, the fact that "[a]n EIS was prepared and was available for the guidance of the agency prior to the selection of the specific route" satisfies the requirements of MEPA. If, however, the EIS that was prepared did not include Route 7, how could it have guided the agency in its decision of which route to select?

Although respondents contended in oral argument before this court that the EIS covered Route 7, an analysis of the document itself suggests otherwise. Route 7 was not part of the draft EIS because it was added to the list of potential routes after the EIS had already been commissioned, and it was covered only cursorily in the final EIS submitted to the MEQC. Since Route 7 was not analyzed in the same depth as the other routes,[19] the EIS, as written, could not have helped the decisionmaker to evaluate the relative damages to the three routes under consideration and to make a meaningful choice among them.[20]

On remand, therefore, if Route 7 is still seriously considered, the MEQC will have to prepare a new EIS that treats all the routes comparably. If the MEQC decides that compliance with other parts of this opinion

requires it to choose Route 3, then no new EIS need be produced. If, however, after more evidence is received, the MEQC decides that significant noncompensable damage will be caused by utilizing the existing right-of-way, before it can choose between Route 3 and Route 7, it will have to produce an adequate EIS that can play a meaningful role in helping it to reach its ultimate decision.

█ 5. *The Impossibility of Judicial Review.* Whenever appellate review is sought, the reviewing court must decide whether the findings of fact below are sufficiently specific to permit it to exercise this function. According to *Bryan v. Community State Bank,* 285 Minn. 226, 233, 172 N.W.2d 771, 775 (1969), judicial review of decisionmaking is only possible if the agency states with clarity and completeness the facts and conclusions essential to its decision so that the reviewing court can determine whether the facts support the agency's action.

In its pleading in intervention and its appeal to the district court, PEER specifically argued that the MEQC failed to recognize the adverse environmental impact that utilization of Route 7 would have on Long Lake and the virgin forest of oaks. The district court disposed of this argument by holding:

"  *  *  * The Findings of Fact were sufficiently specific to adequately apprise this Court of the basis for the agency's decision. They complied with the requirements set out in *Bryan*  *  *  * and therefore no reasons for the decision are necessary."

Contrary to the position taken by the trial court, the MEQC's findings of fact, conclusions and recommendations do not

---

**19.** Route 7 was not one of the routes proposed by NSP. Thus, it was not analyzed in the NSP materials presented to the MEQC. This might explain the cursory attention given to Route 7 in the final EIS, since there seems to be an unfortunate tendency by agencies to rely too heavily on the applicant's research when preparing an EIS. See, *No Power Line, Inc. v. Minnesota EQC,* Minn., 262 N.W.2d 312, 327, and cases cited therein.

**20.** In this regard, we should also reiterate that the prudent and feasible alternative standard requires much more specificity in the information included in the EIS than the MEQC appears presently to demand. The overly general nature of much of the EIS leaves it open to attack on the ground of inadequacy. See, e. g., *Lathan v. Brinegar,* 506 F.2d 677, 693 (9 Cir. 1974).

satisfy the test of Bryan outlined above. Finding # 13 states that "route 7 \* \* \* minimizes disruption to recreational and historical land uses in comparison with proposed route 3 due to the fact that proposed route 3 does contain lakeshore area." In Finding # 16, another reference is made to the lakeshore area in Route 3. Nowhere, however, is there any reference to Long Lake and whether Route 7 would impact it at all. Thus, it is impossible to claim, as the MEQC does in its brief, that the hearing examiner "balanc[ed] out the relative impacts to Long Lake and Sunnybrook Lake" or that either he or the MEQC "found route 3's impact on Sunnybrook to be more severe than the impact of route 7 on Long Lake." Instead, it is much more plausible to assume from the complete failure to mention Long Lake in the findings of fact that both the hearing examiner and the MEQC never examined Route 7's impact on Long Lake. This conclusion is also supported by the failure of the MEQC to require in the construction permit that the edge of Long Lake be avoided. The hearing examiner's and the MEQC's findings of fact state that the HVTL be constructed around Northport Airport in Washington County but do not include a similar provision regarding Long Lake. Thus, it is impossible to conclude, as the MEQC contends in its brief, that the MEQC intended the HVTL to avoid the shore of Long Lake.

A similar conclusion is suggested with regard to the effect of Route 7 on the oak woodland. In its brief, the MEQC claims that it made a specific finding about the oak woodland, referring to Finding # 14, which states that "proposed routes 3 and 7 are comparable in minimizing disruption to natural systems." Rather than supporting the MEQC's claim, however, Finding # 14 demonstrates that the MEQC was either unaware of or ignored the existence of the oak woodland in Route 7, especially since there is no indication of a similar woodland in Route 3 that would allow the hearing examiner and the MEQC to conclude that both routes are "comparable in minimizing disruption to natural systems."

Since it is impossible to discern from the findings of fact whether the hearing examiner and the MEQC even entered the existence of Long Lake and the oak woodland into their balancing process, a reviewing court cannot possibly decide whether substantial evidence exists to support the MEQC's conclusions. In order to satisfy the Bryan test in a case like this, the findings of fact would have to provide at least the following information to the reviewing court:

(1) the kind and character of the homes that would be condemned in each route;

(2) the kind of intrusion on Long Lake that would be caused by utilizing Route 7;

(3) the specific impact of the HVTL on Sunnybrook Lake so that a meaningful comparison between the two lakes could be made; and

(4) the specific characteristics of the oak forest, which requires more than merely a statement that it is composed of virgin oak. Only if information such as this is included in the findings of fact can a reviewing court properly perform its function.

Under most circumstances, the proper disposition of an appeal that challenges the specificity of the factfinding process would be a remand to the agency for more specific findings of fact. Such a disposition is unnecessary here since we are remanding the case to the agency for additional findings of fact concerning noncompensable damage to the homeowners along Route 3. In making these supplementary findings of fact, however, and in all future proceedings, the agency and hearing examiners should avoid issuing such overly general findings which make judicial review impossible.

6. *Interrogatories.* In its appeal from the MEQC decision to the district court, PEER alleged that the members of the MEQC were not all familiar with the transcript and other documents pertaining to the public hearings on the route selection. The district court held that it was not necessary to investigate the individual mental processes of the members of the MEQC

because its findings were supported by substantial evidence. Since we have concluded that the findings were not sufficiently specific to permit judicial review, PEER's allegation of administrative impropriety is revived.

When a hearing examiner is utilized by an agency, Minn.St. 15.0418 of the Administrative Procedure Act (APA) requires that all evidence submitted to him be certified to the agency, and § 15.0421 mandates that the parties to the proceedings get an opportunity to file exceptions and present arguments to the agency, and that the final decision then be rendered by the *officials* of the agency. Any suggestion that route-selection hearings might not be "contested cases" within the meaning of the APA was laid to rest by the legislature in its 1977 revisions of the PPSA, L.1977, c. 439, § 11, which appears to be merely a codification of existing MEQC practices. Thus, MEQC decisionmaking is governed by the APA, and it becomes extremely important for appellants to discover whether the officials themselves actually made the decision as the APA requires or whether they simply rubber-stamped the findings of fact, conclusions, and recommendations submitted to the MEQC by the hearing examiner.

▮ The MEQC members refused to respond either to PEER's requests for admission or to the interrogatories on this issue on the ground that the information was privileged. While it is true that it is generally not proper to permit discovery of the mental processes by which an administrative decision is made, *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), in *Mampel v. Eastern Heights State Bank*, Minn., 254 N.W.2d 375, 378 (1977), we allowed persons seeking judicial review of agency decisionmaking to "make inquiry through discovery to determine whether the agency adhered to statutorily defined procedures or the rules and regulations promulgated by the agency itself which enter into the fundamental decisionmaking process." We reaffirm that holding today.

In order to insure that the statutory scheme is not thwarted and that the validity of administrative decisionmaking does not become suspect, it is necessary to permit limited discovery when a statute requires specified persons to make decisions. See, 50 Wash.L.Rev. 739, 744. Under the APA the agency must review the evidence and findings amassed by a hearing examiner and come to an independent decision. Thus, the legislature clearly intended agency members to read the material presented to it prior to reaching their decision. To ensure that agency actions comport with this legislative intent, parties must be permitted to elicit from agency members sufficient information to establish that the problem had been addressed and that agency functions have been performed properly. Thus, the district court erred in failing to require MEQC members to respond to PEER's interrogatories.

We must emphasize, however, that the discovery we sanction is limited to information concerning the *procedural steps* that may be *required by law* and does not extend to inquiries into the mental processes of an administrator which, being part of the judgmental process, are not discoverable under *United States v. Morgan, supra*. It should be clear that this rule would similarly protect from discovery the process of judicial decisionmaking which is judgmental rather than procedural in nature.

7. *Conclusion*. After carefully reviewing Minnesota's statutory scheme for protecting the environment, it is our conclusion that the principles of MERA apply to MEQC decisions made pursuant to the PPSA and that all regulations governing the routing of HVTLs must be consistent with it and other relevant environmental legislation. Implicit in the operation of MERA is the principle that environmentally damaging action cannot be taken if there is another, less damaging way to achieve the desired result. In order to protect Minnesota's noncompensable resources, whose impairment appears to harm no one directly, MERA makes a prima facie showing of environmental damage by any concerned citizen or group sufficient to shift the bur-

den to the proponents of the action to establish that there is no prudent and feasible alternative which will be less destructive to the environment.

Since PEER made a prima facie showing under MERA that the choice of Route 7 would impair, pollute, or destroy protectible natural resources, before the MEQC could approve the hearing examiner's recommendation, the record would have to demonstrate that there were no prudent and feasible alternatives to proposed Route 7. Route 3, an existing HVTL right-of-way, would appear from the evidence to be such a prudent and feasible alternative whose choice would be consistent not only with MERA but also with the nonproliferation principles contained in the PPSA and MEPA. Thus, unless there were compelling evidence in the record of noncompensable damages which would result from the choice of Route 3, no basis existed for the MEQC's choice of Route 7. The fact that Route 7 would require the condemnation of fewer homes than Route 3 cannot in and of itself support the MEQC decision. The loss of some homes is not equivalent to the human impact which must be minimized under the PPSA unless it can first be established that the homes to be condemned are, because of their unique characteristics, not replaceable. The burden of demonstrating the noncompensable aspects of the homes to be condemned is on the homeowners themselves, and failure to meet this burden should have resulted in the automatic choice of the existing right-of-way.

Had the MEQC properly carried out its statutory duty to avoid proliferation of rights-of-way, and had it weighed its selection criteria in favor of nonproliferation and the protection of its noncompensable natural resources, the hearing examiner and the agency itself would not have been able to choose Route 7 over Route 3. Although the record clearly mandates the selection of Route 3, principles of fairness require a remand in this case to permit affected homeowners to introduce evidence concerning the uniqueness of their residences.

Therefore, we remand to the district court for remand to the MEQC, with directions to conduct further hearings consistent with this opinion on the issue of noncompensable damages. The district court should direct the MEQC to give notice to affected residents along Route 3 that they will have 30 days within which to present such evidence. If, after receiving this new evidence, the MEQC decides that the homeowners have not sustained their burden of proof, Route 3 should be designated. If, however, they demonstrate that the homes to be condemned are noncompensable resources, the MEQC will then have to balance that damage against the environmental damage that would be caused by constructing the HVTL along Route 7. If the MEQC reaches this step, a new EIS will have to be produced which provides sufficient detailed and comparable information on all the routes then under consideration. Such balancing, however, cannot be conducted in a vacuum, and the MEQC decision must be consistent with the strong nonproliferation policy reflected in recent legislative and judicial pronouncements.

Reversed and remanded.

## ADDENDUM

Petitioners, Environmentally Concerned Citizens Organization (ECCO), an unincorporated association; Charles Josephs; Ken Kurttila; and Wallace Oien, request permission to intervene in the appeal before this court, pursuant to the Minnesota Environmental Rights Act, Minn.St. 116B.09, and seek reconsideration by the court, pursuant to Rule 140, Rules of Appellate Procedure, of certain aspects of its decision in *PEER v. MEQC*, filed April 7, 1978. For the reasons discussed below, the petition for intervention and for rehearing is denied.

Initially, we deny the petition for rehearing because petitioners are not parties to the proceedings. Petitioners' failure to intervene in the district court action that culminated in this appeal precludes their invocation of the Rules of Civil Appellate Procedure which govern only the parties to an appeal. Thus, their petition for rehearing is improper.

 Petitioners seek to cure this fundamental defect by requesting permission to intervene. Their status as intervenors would then permit them to petition for reargument under Rule 140. Intervention at this late date, however, can serve no meaningful purpose, since the process of judicial review has already been completed. Moreover, we do not believe that the legislature intended § 116B.09 to permit intervention at this point in the litigation. Instead, § 116B.09 sanctions only intervention in the original administrative proceedings themselves or in their review in district court.

 For this same reason intervention by ECCO in the proceedings before the MEQC pursuant to our remand would be improper. To the extent that individual members of ECCO or the named petitioners participated in the original proceedings, however, they are free, upon remand, to petition the MEQC to broaden the scope of inquiry to include such relevant issues as whether PEER's allegations of environmental damage to the oak forest and Long Lake have a factual basis and whether paralleling of the HVTL and the existing 230kV line would be inappropriate under the circumstances presented by this case.[1] Because these issues were never before the MEQC or the district court, they would be proper subjects for consideration on remand.

 Although the MEQC clearly has the authority to grant such a petition at the request of a proper party, in reaching its decision it must weigh the benefits that will accrue from the gathering of additional information against the detrimental effects of dragging out the course of this litigation. To the extent that, in its judgment, broadening the scope of the inquiry can be done without jeopardizing the public's need for electricity and the policy of the PPSA that "electric energy needs [be] met and fulfilled in an orderly and timely fashion," Minn.St. 116C.55, subd. 1 (1976), such a resolution would be proper. Our previously filed decision in this case merely defines the areas concerning which a hearing is required on remand, and it should not be interpreted as narrowing the MEQC's authority to hear evidence on issues that it determines are necessary to help it choose the route that best complies with the principles of all applicable environmental legislation.

---

1. ECCO raises four issues for consideration on remand on its petition for intervention. The last two of these are adequately covered in our decision and need no additional mention here.