FLOODWOOD–FINE LAKES CITIZENS GROUP, et al., Respondents,

v.

MINNESOTA ENVIRONMENTAL QUALITY COUNCIL, Appellant (49181),

Society Concerned About a Ravaged Environment, Inc. (SCARE, Inc.), Appellant (49203),

and

GREAT LAKES TRANSMISSION COMPANY, Respondent,

v.

MINNESOTA ENVIRONMENTAL QUALITY COUNCIL, Appellant (49181),

Society Concerned About a Ravaged Environment, Inc. (SCARE, Inc.), Appellant (49203).

FLOODWOOD–FINE LAKES CITIZEN GROUP, et al., Respondents,

Minnesota Power & Light Company, Appellant (49224),

v.

MINNESOTA ENVIRONMENTAL QUALITY COUNCIL, Respondent,

Society Concerned About a Ravaged Environment, Inc. (SCARE, Inc.), Respondent,

and

GREAT LAKES TRANSMISSION COMPANY, Respondent,

Minnesota Power & Light Company, Appellant (49224),

v.

MINNESOTA ENVIRONMENTAL QUALITY COUNCIL, Respondent,

Society Concerned About a Ravaged Environment, Inc. (SCARE, Inc.) Respondent.

Nos. 49181, 49203 and 49224.

Supreme Court of Minnesota.

Nov. 9, 1979.

Rehearing Denied Dec. 12, 1979.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., William E. Dorigan, Richard S. Slowes and Stephen Shakman, Sp. Asst. Attys. Gen., St. Paul, for Minnesota Environmental Quality Council.

Bethel E. Anderson, Brookston, for SCARE, Inc.

Philip R. Halverson, Duluth, for Minnesota Power & Light Co.

Donovan & Harper and Donald B. Crassweller, Duluth, Dorsey, Windhorst, Hannaford, Whitney & Halladay and Edward J. Schwartzbauer and Steven F. Wolgamot, Minneapolis, for Great Lakes Gas Transmission Co.

Edwards, Edwards & Bodin and James F. Bodin, Duluth, for Floodwood-Fine Lakes Citizens Group et al.

Broeker, Hartfeldt, Hedges & Grant, Will Hartfeldt and Eleni P. Skevas, Minneapolis, for Clear Air-Clear Water Unlimited, and Minnesota Environmental Control Citizens Assn. and the Sierra Club.

Joseph D. Bizzan, Jr., Popham, Haik, Schnobrich, Kaufman & Doty, Minneapolis, for Northern States Power Co.

OTIS, Justice.

Pursuant to Minn.Stat. § 116C.57 (1976) Minnesota Power & Light Company (MPL) initiated these proceedings on March 11, 1975, by applying to the Minnesota Environmental Quality Council (EQC)[1] for two certificates of site compatibility permitting

1. The agency is now designated Minnesota Environmental Quality Board, Minn.Stat. § 116C.02 (1978).

the construction of two 500 megawatt electric power generating plants, one near Brookston in southwestern St. Louis County and one near Cohasset in south-central Itasca County.[2] EQC ultimately selected on its own initiative a. site designated as Floodwood/Fine Lakes (Fine Lakes). Three parties in intervention sought and obtained review in the District Court of St. Louis County, Floodwood-Fine Lakes Citizen Group (Citizens), Great Lakes Gas Transmission Company (Great Lakes), and MPL.

Opposing motions for summary judgment were made by Citizens and Great Lakes on one side and EQC on the other. On April 28, 1978 (with an amendment on July 6, 1978) the District Court held that in the absence of criteria and standards and an inventory of potential large electric power generating plant sites, mandated by Minn. Stat. § 116C.55, subd. 3 (1976), EQC was without authority under Minn.Stat. § 116C.57, subd. 1 (1976), to designate the Fine Lakes site. Accordingly, the court declared such designation to be null and void and granted summary judgment in favor of Citizens, Great Lakes, and MPL.

On appeal to this court two parties, EQC and an intervenor, Society Concerned About a Ravaged Environment (SCARE), are joined by four parties amicus, Citizens Against Power Plant Pollution; Clear Air-Clear Water, Unlimited; Minnesota Environmental Control Citizens Association; and the Sierra Club, who seek to reverse the trial court and either to reinstate Fine Lakes as the designated site or permit EQC rather than MPL to select an alternative site. MPL seeks a mandate restoring Brookston as the designated site. Citizens and Great Lakes ask only that we affirm the trial court in holding the Fine Lakes site invalid.

We reverse the judgment of the trial court as amended by its order of July 6, 1978, and remand for further expedited proceedings limited to the issues over which we find the trial court retains jurisdiction.

Although the trial court decided the case on the narrow issue of whether or not an inventory of potential plant sites was a jurisdictional prerequisite to the EQC assuming jurisdiction in selecting a site, we feel it appropriate to comment on collateral issues which the trial court must resolve on the remand. These issues deal with the adequacy of notice to interested parties, the conduct of public hearings, and the role of MPL, the EQC, and the trial court in specifying the site which will ultimately be selected.

The MPL is a Duluth-based utility supplying electrical power to consumers in northeastern Minnesota and Wisconsin. Pursuant to the authority vested in EQC by Minn.Stat. §§ 116C.53; .57, subd. 1 (1976), MPL petitioned EQC for a certificate of site compatibility to construct a 500 megawatt large electric power generating plant, naming Brookston as its preferred site, with an alternate site near Floodwood. Although MPL questioned the authority of EQC to select a site not proposed in its application, without a published inventory, MPL waived that objection in return for the right to enlarge the proposed plant from 500 megawatts to 800 megawatts.

On July 8, 1975, the EQC authorized the appointment of a citizens site evaluation committee pursuant to Minn.Stat. § 116C.59 (1978) and Minn.Reg. MEQC 73(b)(2)(bb) (1974). That committee was charged with the duty of evaluating eight sites proposed by MPL as well as studying additional sites which might be proposed by EQC. Contemporaneously Mr. John H. Herman was appointed as hearing officer to make findings and recommendations with respect to the merits of the various sites proposed. He conducted five public hearings between November 3 and December 16, 1975, in St. Paul, Grand Rapids, Floodwood, and Brookston.

The power plant siting staff on April 13, 1976, recommended as an alternative site for Brookston the Fine Lakes site here for

consideration. The site evaluation committee and the hearing officer ultimately supported that designation.

Nine public hearings were held between July 8 and August 13, 1976, to consider alternatives to the Brookston site. They took place in Brookston, Floodwood, and Duluth. Representatives of Citizens and of SCARE attended those hearings taking opposing positions. Representatives of Great Lakes appeared at the public hearing in Duluth on August 5 and presented testimony. A memorandum outlining its concerns was presented to the hearing officer on August 27, 1976, a month and a half after Great Lakes learned of the proposed Fine Lakes site on July 13. The hearing officer kept the record open for twenty days following the conclusion of testimony on August 13, 1976, to allow interested persons an opportunity to submit written testimony. Thirteen days additional time was granted for the appellant's brief and any rebuttal briefs.

In the findings filed by the hearing officer on September 24, 1976, he described the 800 megawatt electric power generating plant as consisting of a large block type structure approximately 270 feet in height serviced by railroad spurs, switching yards, coal train unloading equipment, coal storage areas, transmission lines, air and water quality control systems, solid waste disposal ponds, and mechanical draft water cooling towers. The electricity would be generated by steam power with pulverized coal and would consume 960,000 pounds of coal per hour. Coal would be conveyed to the site by trains containing 95 to 105 cars carrying 100 tons in each car, six or seven times a week. At full load the unit would reject about 4.1 billion BTUs per hour of thermal energy in the form of heated water. It would require a stack of approximately 700 feet in height to comply with air quality standards. Substantial acreage would be needed for on-site disposal of wastes and for setback and aesthetic purposes to insulate the plant from the St. Louis River.

The three sites discussed by the hearing officer are all located on the St. Louis River. The Brookston site is about two and one-half miles northwest of the town of Brookston on the north side of the river, the Floodwood site is about five miles west of the Brookston site on the north side of the river, and the Fine Lakes site is about five miles southwest of the Floodwood site on the south side of the river, some three miles south of the town of Floodwood.

In specifying Fine Lakes as the preferred location, the hearing officer listed the following factors as influencing his decision:

(1) Impacts of population displacement, favoring Brookston

(2) Audible and visual impacts on recreation, favoring Floodwood/Fine Lakes

(3) Geological reliability of solid waste storage, favoring Floodwood/Fine Lakes

(4) On-site aquatic ecology, favoring Floodwood/Fine Lakes

(5) Impact on avoidance areas of high voltage transmission lines (HVTL) and transportation access routes, favoring Floodwood/Fine Lakes

In compliance with Minn.Stat. § 116B.09, subd. 2 (1978), the hearing officer stated: "Environmental considerations were given 'paramount' importance and 'economics alone' was not dispositive of the recommendation." [3]

In his findings the hearing officer noted:

The record and the testimony of the PCA, DNR, Highway Department, and

---

3. Minn.Stat. § 116B.09, subd. 2 (1978), provides as follows:

Subd. 2. In any such administrative, licensing, or other similar proceedings, the agency shall consider the alleged impairment, pollution, or destruction of the air, water, land, or other natural resources located within the state and no conduct shall be authorized or approved which does, or is likely to have such effect so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land, and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

Health Department support the finding that an 800 MW electric power generating unit is fully licensable at any of the undeveloped sites under consideration.

With respect to the adverse impact on Fine Lakes, the hearing officer found:

The displacement of individuals for a project of this sort is the most painful part of the decision-making process. Although this hearing officer does not pass on the question of need, assuming that the facility is needed, it is clearly the state's policy that individuals must give way to the overall state benefit, thus power companies have been granted the power of eminent domain. While the value of the dwellings, the agricultural richness of the land and the absolute numbers involved here are more relatively significant rather than absolutely significant, displacement is clearly the most significant adverse effect of the Floodwood/Fine Lakes site and makes this decision very difficult.

In conclusion the hearing officer found that none of the three sites is clearly unacceptable but Floodwood was the least desirable. As between Brookston and Fine Lakes, he made the following comparisons:

*Favor F[ine Lakes]*
Geology (L) *
On-site Aquatic Ecology (L)
Audible Impact on River (L)
Avoid Impact on Avoidance Areas (L)
HVTL Visibility (M)
Disruption of Local Community (M)
Air Quality/Health (S)
Vegetation and Terrestrial Ecology (S)
*Favor B[rookston]*
Population Displacement (L)
Offsite Aquatic Ecology (M)
Larger Capacity (S)
Residential Choice (S)
Fog and Icing (S)
Non-recreational LEPGP Visual Impact (S)
*Non-Distinguishing*
Driving Time
Land Use
Water Use and Availability
Water Pollution
Conservation of Energy
Load Proximity
Economic Costs and Reliability
Traffic
Visual-recreational LEPGP Impact
* (L)—Large
 (M)—Medium
 (S)—Small

On the basis of his findings the hearing officer reached the following conclusions and recommendations:

A. The Floodwood/Fine Lakes Site is the most suitable site upon which to locate, construct, and operate one coal fired steam electric power unit which will have an approximate net generating capacity of 800 MW of electric power for transmission and distribution, and the EQC should issue a Certificate of Site Compatibility for such a unit in the form attached hereto.

B. Based upon the design concepts set forth in the application and other presently available information, the proposed 800 MW LEPGP at Floodwood/Fine Lakes will be in compliance with all state agency standards, policies, and regulations governing construction and operation of such facilities.

C. The adverse human, environmental and socio-economic impacts of the proposed LEPGP and associated facilities to be constructed and operated will be minimized at the Floodwood/Fine Lakes Site, Minn.Stat. § 116D.02, Subd. 2(i), and maximizes responsiveness to the siting criteria in Minn.Reg. MEQC 74.

D. There exists no feasible and prudent alternative having lesser environmental consequences as compared to siting this 800 MW unit at Floodwood/Fine Lakes.

E. In order to ensure that appropriate environmental consideration will be given to significant alterations of the proposed LEPGP and associated facilities as may be required by other state agencies as a prerequisite to the issuance of required permits and licenses, conditions should be

included in the Certificate of Site Compatibility to be issued by the Minnesota Environmental Quality Council in the language set forth in the following form of Certificate.

With some amendments not here pertinent, by a vote of ten to one, the EQC adopted the hearing officer's findings, conclusions, and recommendations at its meeting on October 12, 1976, and issued to MPL a Certificate of Site Compatibility for the Fine Lakes site.

Pursuant to Minn.Stat. § 116C.65 (1976) appeals were taken by Citizens, Great Lakes, and MPL to the District Court of St. Louis County. Those parties as well as EQC sought summary judgment. The trial court heard the matter on the record and made findings of fact, and conclusions of law granting Citizens and Great Lakes summary judgment and remanding the matter to EQC for further proceedings.

The trial court found that because the Fine Lakes site was not included in the MPL application, interested parties did not have adequate notice of the proposal to select it as an alternative.

The single finding on which the trial court's decision turned, however, was the fact that EQC had never assembled and published either an inventory of potential large electric power generating plant sites or criteria and standards for developing such an inventory. The court held as a tentative conclusion that it was not necessary to pass on the question of whether Great Lakes had actual notice of the consideration of Fine Lakes because of the appearance and participation of Great Lakes in the siting hearings.

With respect to the inventory, the court adopted the following conclusion of law: "In the absence of that Inventory and the criteria and standards, the MEQC was without authority to * * * offer, propose, consider, or designate the Floodwood-Fine Lakes site." Consequently, the court held the designation of that site to be "contrary to law, null and void and of no force and effect." In an accompanying memo the court stressed the fact that failure to prepare the inventory pursuant to Minn.Stat. § 116C.55, subd. 3 (1976), deprived interested persons of an opportunity to participate in the process of choosing an appropriate site. The court was of the view that as a consequence "the public hearing process was eliminated to a large extent." Because the statute repeatedly referred to the inventory in the Power Plant Siting Act (PPSA), Minn.Stat. §§ 116C.51–.69 (1976), and retained the use of the word "inventory" in the amendments to the PPSA enacted by Chapter 439 of the Laws of 1977, the court concluded it was the intention of the legislature to continue its policy of permitting plant sites to be selected only after the public and all interested persons had an opportunity to be heard during the process of preparing and publishing an inventory.

The court rejected the contention of EQC that *PEER v. MEQC*, 266 N.W.2d 858 (Minn.1978) authorized it "to seek out feasible and prudent alternatives" to MPL's proposal. The court was of the opinion that our decision in that case should not be construed to "obliterate the specific and mandatory Inventory requirements of the PPSA."

Finally, the court refused the request by Citizens and Great Lakes that it designate Brookston or Floodwood if it vacated and annulled the Fine Lakes site. The court remanded the matter to the EQC to proceed in compliance with the statutes as the court construed them.

*I. The Inventory Requirement.*

1. & 2. At the time MPL applied to EQC for a certificate of site compatibility to build a large electric power generating plant at Brookston in 1975, the PPSA required the EQC to designate sites from a pre-selected inventory of potential sites. Minn.Stat. § 116C.55 (1976), as then drafted, provided as follows:

Subdivision 1. Policy. The legislature hereby declares it to be the policy of the state to site large electric power facilities in an orderly manner compatible with environmental preservation and the effi-

cient use of resources. In accordance with this policy, the environmental quality board shall choose sites that minimize adverse human and environmental impact while insuring continuing electric power system reliability and integrity and insuring that electric energy needs are met and fulfilled in an orderly and timely fashion.

Subd. 2. Inventory criteria; public hearings. The board shall promptly initiate a public planning process where all interested persons can participate in developing the criteria and standards to be used by the board in preparing an inventory of potential large electric power generating plant sites and high voltage transmission line corridors and to guide the site suitability evaluation and selection process. The participatory process shall include, but should not be limited to public hearings. Before substantial modifications of the initial criteria and standards are adopted, additional public hearings shall be held. Such criteria and standards shall be promulgated on or before July 1, 1974.

Subd. 3. Inventory of potential large electric power generating plant sites and high voltage transmission line corridors. On or before July 1, 1975, the board shall assemble and publish an inventory of potential large electric power generating plant sites and high voltage transmission line corridors. The inventory report of potential large electric power generating plant sites and high voltage transmission line corridors shall set forth the criteria and standards used in developing the potential site and corridor inventory. After completion of its initial inventory of potential sites and corridors, the board shall have a continuing responsibility to evaluate, update and publish its inventory and if, due to changed circumstances or information, a site or corridor is inconsistent with prescribed criteria or does not meet prescribed standards, such site or corridor shall be removed from the inventory of potential sites and corridors.

Numerous references were made to the requirement of an inventory throughout the act including Minn.Stat. §§ 116C.56, .57. However, this procedure proved to be impractical, unworkable, and improvidently prescribed. It meant that within one year the EQC was obliged to study in depth numerous areas in the state suitable for the construction of power plants which would never be built, thereby needlessly dissipating the resources of the EQC. The net effect would be to alarm unnecessarily the residents in areas which would have been included in the inventory but not subsequently utilized. Although the public utilities that applied for specific certificates of site compatibility were obliged to pay the state fees commensurate with the cost of conducting the site selection proceedings, no such funding was available to the EQC for completing the equally onerous undertaking of preparing an inventory of numerous sites.

In recognition of the awkward and unnecessary processes set forth in Minn.Stat. § 116C.55, subds. 2, 3 (1976), those sections of the statute were amended by Chapter 439 of Laws of 1977. Now, instead of requiring an inventory of potential large electric power generating plant sites, the statute calls for an inventory of study areas. Those sections of the statute presently provide as follows, Minn.Stat. § 116C.55 (1978):

Subd. 2. Inventory criteria; public hearings. The board shall promptly initiate a public planning process where all interested persons can participate in developing the criteria and standards to be used by the board in preparing an inventory of large electric power generating plant study areas and to guide the site and route suitability evaluation and selection process. The participatory process shall include, but should not be limited to public hearings. Before substantial modifications of the initial criteria and standards are adopted, additional public hearings shall be held. All hearings conducted under this subdivision shall be conducted pursuant to the rulemaking provisions of chapter 15.

Subd. 3. Inventory of large electric power generating plant study areas. On

or before January 1, 1979, the board shall adopt an inventory of large electric power generating plant study areas and publish an inventory report. The inventory report shall specify the planning policies, criteria and standards used in developing the inventory. After completion of its initial inventory the board shall have a continuing responsibility to evaluate, update and publish its inventory.

 We find merit in the contention of EQC that the Power Plant Siting Act must be construed to harmonize with Chapter 116B, the Environmental Rights Act, Minn. Stat. §§ 116C.01–.34 (1978) governing the Environmental Quality Board, and Chapter 116D, the Minnesota Environmental Policy Act. In *PEER v. MEQC*, 266 N.W.2d 858, 865 (Minn.1978), we stated:

Although the focus of each of these statutes is slightly different, together they are part of a coherent legislative policy, one of whose aims is to harmonize the need for electric power with the equally important goal of environmental protection. Recognizing that the MEQC constituted the best pool of environmentally skilled personnel, the legislature chose it to administer the PPSA. To ensure that the MEQC would not sacrifice environmental protection in its attempt to site power plants and HVTLs as efficiently as possible, it required that "to the fullest extent practicable the policies, regulations and public laws of the state shall be interpreted and administered in accordance with the policies set forth in [MEPA]." Section 116D.03. And, if the MEQC failed to comply with the mandates of MEPA and the PPSA, MERA existed to permit private citizens to bring a civil action to compel the agency to consider environmental factors.

Each of the acts referred to prohibits any activity which significantly affects the quality of the environment if there is a "feasible and prudent alternative" consistent with the "state's paramount concern for the protection of its air, water, land, and other natural resources from pollution, impairment or destruction. Economics alone

shall not justify such conduct." Minn.Stat. § 116B.09, subd. 2 (1978).

The same concerns are expressed in Minn. Stat. § 116D.03, subd. 2(d) (1978). The EQC is specifically authorized to examine sites other than those proposed by the utilities. Minn.Stat. § 116C.57, subds. 1, 4(7) (1978). Minn.Stat. § 116C.01 (1978) underscores the policy of seeking alternative solutions.

The effect of the PPSA was to transfer from the utilities the exclusive prerogative of selecting plant sites by conferring on the EQC the ultimate responsibility for designating sites which will "minimize adverse human and environmental impact while insuring continuing electric power system reliability and integrity and insuring that electric energy needs are met and fulfilled in an orderly and timely fashion." Minn. Stat. § 116C.53, subd. 1 (1978).

It can hardly be denied that as originally drafted the act made it the duty of the EQC to prepare an inventory of potential power plant sites, and required utilities to limit their applications to areas contained in the inventory. However, for us to hold that the preparation of such an inventory was a jurisdictional prerequisite would totally frustrate present legislative policy. In the light of the intervening amendments, which repealed the necessity for selecting a site from the inventory, a procedure now rejected by the legislature will not be invoked to render this litigation futile and invalid. The amended statute adopted on June 2, 1977, reads in part as follows:

Pursuant to sections 116C.57 to 116C.60, the board shall study and evaluate any site proposed by a utility and any other site the board deems necessary which was proposed in a manner consistent with rules adopted by the board concerning the form, content, and timeliness of proposals for alternate sites.

Minn.Stat. § 116C.57, subd. 1 (1978).

We regard the inventory requirement as a procedural rather than a substantive provision of the law to the extent that if the selection of Fine Lakes meets all of the other requirements of the environmental statutes, and would have been included in

an inventory had one been prepared, the parties and the public should not now be subjected to the inevitable expense, delay, and inconvenience of requiring EQC to go through the now obsolete motions of preparing an inventory.[4] Accordingly, we hold that the designation of EQC of the Fine Lakes site is not null and void because of its failure to select the site from an inventory specified in Minn.Stat. § 116C.55 (1976) prior to its amendment.

### II. Notice to Interested Parties of Public Hearings.

■ 3. The trial court found that Great Lakes did not have actual notice of consideration of the Fine Lakes site until after the commencement of the hearings. In addition, the court was of the view that "the public hearing process was eliminated to a large extent" by the failure to pursue inventory procedures.

Throughout the Power Plant Siting Act, e. g., Minn.Stat. §§ 116C.55, .58, .60 (1978), there are numerous references to the need for adequate notice to interested parties of public hearings. Specifically, that policy is spelled out in § 116C.59, subd. 2 (1978), as follows:

> The board shall adopt broad spectrum citizen participation as a principal of operation. The form of public participation shall not be limited to public hearings and advisory committees and shall be consistent with the board's rules, regulations and guidelines as provided for in section 116C.66.

We underscored this legislative purpose in No Power Line, Inc. v. MEQC, 262 N.W.2d 312, 321 (1977).

The EQC's Regulation, Minn.Reg. MEQC 73(b)(2)(cc)(ii) (1974), required that notice be given at least thirty days prior to public hearings. It is conceded that Great Lakes did not receive such notice but did participate in the hearings after they had begun. As we, have previously indicated, the hearing officer afforded Great Lakes the right to present evidence and to file a memorandum setting forth its position in opposition to Fine Lakes. Although Great Lakes complains that it was deprived of an opportunity to make a more comprehensive presentation, it does not specify any evidence which might have affected the outcome had Great Lakes been provided with earlier notice. There were, as we have stated, in the spring of 1976 numerous public hearings and a number of articles in various newspapers in Duluth, Floodwood, Grand Rapids, and other communities. A number of publications announcing upcoming hearings in June and July in Floodwood and Brookston showed Fine Lakes as one of the sites for consideration.

Although the trial court reached the tentative conclusion that Great Lakes "waived any objections to a lack of notice by their appearance and participation in the siting hearings" the court was of the opinion that it was not necessary to address that issue since the absence of an inventory was dispositive. In view of the numerous public hearings to which we have referred, and the widespread publicity which attended them, we are of the opinion that there was substantial compliance with the notice requirements of the statute and of the EQC regulations. We also agree with the trial court's conclusion that the appearance and participation of Great Lakes in the hearings conducted during August of 1976 waived any right Great Lakes might have to question the sufficiency of its notice.

### III. The Scope of Review on Remand.

4. Although this appeal is from a summary judgment and there has been no trial on the merits, most of the significant issues which will govern the ultimate outcome of this litigation have been briefed and argued in this court. It has now been four and one-half years since MPL applied for a certificate of site compatibility. Accordingly,

---

4. In No Power Line, Inc. v. MEQC, 262 N.W.2d 312, 324 n. 32 (Minn.1977), we took note of the fact that the EQC had never complied with the statutory direction to assemble and publish an inventory of potential sites. This was not an issue before the court in that case but suggests that we treated it merely as a procedural matter.

it is essential that there be an expedited hearing in the trial court on the narrow issues which remain.

■ The trial court has already ruled that if the designation of the Fine Lakes site by EQC is held to be invalid, the proceedings must be remanded to the agency for further action since the court has no jurisdiction to select an alternative site. We concur in that view and affirm the trial court's decision in that regard.

Minn.Stat. § 116C.65 (1978) specifies the procedure for taking appeals to the district court from orders entered by the EQC. Chapter 439 of the Laws of 1977 adds the following language omitted in the prior statute: "The scope of judicial review shall be as prescribed in § 15.024" of the Administrative Procedure Act. The parties have now had adequate opportunity in the trial court and in this court to litigate constitutional and statutory issues with respect to siting procedures. We therefore are of the opinion that upon remand the only issue remaining is whether or not the decision of the EQC, designating Fine Lakes as its choice for the construction of the power plant contemplated by MPL, is supported by substantial evidence in view of the entire record, or is arbitrary or capricious.

The scope of review of an agency decision by the trial court has been fully discussed in two recent decisions, *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808 (Minn.1977) and *No Power Line, Inc. v. MEQC*, 262 N.W.2d 312 (Minn.1977). However, as we view this record two issues emerge which require special consideration by the trial court. One is the necessity for relocating residents in the Fine Lakes area, and the other is the problem of protecting two thirty-six inch gas pipelines which cross that site. As we have noted, the hearing officer found that displacement of individuals from their residences "is clearly the most significant adverse effect of the Floodwood/Fine Lakes site and makes this decision very difficult." It appears that fourteen permanent residents will be affected. Seventeen of the private landowners, owning sixty-three per-

cent of the area, were engaged in agriculture. There was evidence that a substantial number of residents in Brookston would welcome the location of the power plant at that site, whereas the sentiment of those living in Fine Lakes generally opposed construction in their community.

■ By amendment in 1977 of Minn.Stat. § 116C.53, subd. 1 (1978), the legislature has admonished the EQC to "choose locations that minimize adverse human and environmental impact while insuring continuing electric power system reliability and integrity and insuring that electric energy needs are met and fulfilled in an orderly and timely fashion." Neither the legislature, the courts, nor the environmental agencies are insensitive to the human problems of dislocating families. The task of balancing the impact on the environment with the impact on those who may be dislocated is a difficult and delicate one. Nevertheless the legislature has adopted a policy that leans strongly to the preservation of undeveloped areas which remain in a state of nature. Minn.Stat. § 116B.09, subd. 2 (1978) provides as follows:

> In any such administrative, licensing, or other similar proceedings, the agency shall consider the alleged impairment, pollution, or destruction of the air, water, land, or other natural resources located within the state and no conduct shall be authorized or approved which does, or is likely to have such effect so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's *paramount* concern for the protection of its air, water, land, and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct. (Emphasis added.)

By definition, the word "paramount" as used in the phrase "the state's paramount concern for the protection of its air, water, land and other natural resources" means "superior to all others."[5] This legislative

---

**5.** Webster's Third New International Dictionary 1638 (1961).

policy was construed and applied in *PEER v. MEQC*, 266 N.W.2d 858, 869 (Minn.1978). There we rejected the argument that one power line site was preferable to another because it would require the condemnation of fewer homes, and stated that "condemnation of a number of homes does not, without more, overcome the law's preference for containment of powerlines as expressed in the policy of nonproliferation. Persons who lose their homes can be fully compensated in damages. The destruction of protectible environmental resources, however, is non-compensable and injurious to all present and future residents of Minnesota."

In *PEER*, 266 N.W.2d at 868, we cited *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 827 (Minn.1977) and stated that "we there recognized the state's strongly held commitment * * * 'to protecting the air, water, wildlife, and forests from further impairment and encroachment.'"

With respect to the impact on the Great Lakes gas pipeline by the designation of the Fine Lakes site, the record is unclear. The hearing officer mentioned potential difficulties if the Floodwood site is selected indicating it might be necessary to move or re-enforce the pipeline which crosses that site. However, he did not refer to a similar problem at Fine Lakes. Great Lakes and MPL argue that the two thirty-six inch gas pipelines would be put in serious jeopardy by the construction of the proposed power plant at the Fine Lakes site. The line is located on swampy, spongy soil similar to muskeg and held in place by weights. The dumping of fly ash over the pipelines, it is argued, might well cause a break in the line. It was estimated that the cost of relocation could range from five to fifteen million dollars. The question of whether Great Lakes would be entitled to damages under such circumstances was not addressed. MPL raises the further question of conflicting jurisdiction with federal regulations governing the placement, maintenance, and licensing of interstate pipelines of this size.

These are matters of legitimate concern to MPL and Great Lakes, and those utilities are entitled to present any further arguments which may assist the court in assessing the validity of their claims.

Reversed and remanded.