Robert KRMPOTICH, et al., Appellants (C5–90–2036, C7–90–2037),

Denise Dahlgren, et al., Appellants (C8–90–2354),

v.

The CITY OF DULUTH, Respondent,

Watson Centers, Inc., Intervenor, Respondent.

Nos. C5–90–2036, C7–90–2037 and C8–90–2354.

Court of Appeals of Minnesota.

Aug. 20, 1991.

Review Granted Oct. 11, 1991.

Harold A. Frederick, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, for Krmpotich, et al.

Daniel H. Mundt, Mundt & Associates, Duluth, for Dahlgren, et al.

William P. Dinan, Duluth City Atty., Duluth, for City of Duluth.

A. Blake MacDonald, MacDonald, Munger, Downs & Munger, Duluth, and Bruce D. Malkerson, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for Watson Centers, Inc.

Considered and decided by CRIPPEN, P.J., and FOLEY and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Appellants Krmpotich and Dahlgren, separate citizen groups, oppose a retail mall development proposed by respondent Watson. The Krmpotich appellants challenge various actions of the Duluth City Council that would permit the Watson development, including procedures followed in enacting a rezoning ordinance. The Dahlgren appellants challenge the Watson development under the Minnesota Environmental Rights Act (MERA). The trial court granted summary judgment to respondents Watson and Duluth on the Krmpotich claims. The Dahlgren claim under the Minnesota Environmental Rights Act was tried to the court and also resulted in judgment for respondents. The appeals have been consolidated. We affirm the trial court's judgments against Krmpotich and reverse the decision against Dahlgren's MERA claim.

## FACTS

In 1987 respondent Watson Centers, Inc. (Watson), purchased options to buy three parcels of land as a 35–acre site for a 267,000 square foot strip retail mall and parking lot in the Miller Hill Corridor Area of Duluth. The site is characterized by wetlands, a creek, steep slopes, and flood hazard areas. The Miller Hill Corridor Plan, adopted by the Duluth City Council on December 10, 1979, includes a Land Use and Transportation Plan Map. The plan and map note the desired composition and use of the area in the year 1995 and provide guidelines for monitoring commercial

development to prevent unwarranted, undesirable effects on the natural environment. The mall and parking lot are inconsistent with the plan and map because they do not preserve the existing wetlands.

The Watson proposal requires blasting slopes to cut them back 28 to 40 feet, and to use the 220,000 or more cubic yards of rock thus obtained to fill and "cap" 1.85 acres of wetlands. Also, a stream, known as Coffee Creek, would be rerouted into a culvert. Watson plans to reduce the harm of the wetland destruction by creating three "mitigation" ponds, but generally the plan is to create buildable level land by cutting back hills and filling swamp and creek bed.

Duluth Ready–Mix Concrete owns one of the three parcels and is discharging its waste into the wetlands. The Ready–Mix operation would be eliminated by the Watson development.

Watson sought a variance from the terms of the Duluth Water Resource Management Ordinance (WRMO), vacation of both plat easements and covenant, a special use permit, and rezoning to commercial use of that part of the site now zoned residential. On June 14, 1988, the Duluth Planning Commission granted all of Watson's petitions, with the exception of the rezoning. On April 10, 1989, the city council affirmed the commission's actions, except denial of the rezoning petition was reversed. Earlier, on January 17, 1989, the council had adopted an ordinance which amended the existing zoning ordinance to incorporate the commercial rezoning requested by Watson. This rezoning ordinance contained a reversionary clause which automatically returned the area to a residential zone if construction of the retail mall did not commence within two years.

About May 1, 1989, the Krmpotich and Dahlgren plaintiffs commenced separate lawsuits. Krmpotich sued the City of Du-luth, challenging the council's April 10, 1989, actions (Krmpotich I). Watson intervened. The Dahlgren suit had 14 claims, but primarily challenged the rezoning ordinance as improper zoning. On cross-motions for summary judgment, decided on September 29, 1989, and submitted solely on the city record, all Krmpotich I claims were dismissed. Most of Dahlgren's claims were also dismissed, but the trial court ruled that the rezoning ordinance was invalid because of the reversionary clause, which the court held could rezone "without the proper planning process."

On October 23, 1989, the council enacted a second rezoning ordinance identical to the first except that it omitted the reversionary clause. On January 12, 1990, Krmpotich commenced a second suit (Krmpotich II), challenging the procedures utilized by the council in enacting this second ordinance. By order of June 15, 1990, Krmpotich II's motion for summary judgment was denied; the second ordinance was upheld on summary judgment.

On December 26, 1989, the Dahlgren plaintiffs amended their complaint, seeking a declaration that the council's actions violated the Minnesota Environmental Rights Act. Trial took place on February 5, 1990, and resulted in judgment in favor of the city and Watson.

On August 2, 1990, Dahlgren's motion for a new trial was denied. This court has consolidated Dahlgren and Krmpotich I and II for this appeal.[1]

## ISSUES

I. Was there substantial evidence in the record to support the various city council decisions?

II. Is the first rezoning ordinance severable; or were procedural requirements satisfied by the council when it enacted the second zoning ordinance?

---

1. An earlier appeal, *Krmpotich v. City of Duluth and Watson Centers, Inc.,* No. C6–90–103, 1990 WL 140875 (Minn.App. Oct. 2, 1990), denied an injunction to the Krmpotich plaintiffs. This court noted in that decision that the Watson development would not harm the wetlands. The case was heard and appealed solely on the city record. The MERA issue, raised by Dahlgren here, was not considered in that case. Accordingly, because the present appeal does include the MERA claim, and because of the additional evidence admitted at the February 1990 trial, we are not bound by that decision and reach a different result.

III. Would construction of the retail mall violate the Minnesota Environmental Rights Act by materially and adversely affecting the environment?

## ANALYSIS

Krmpotich I and II were decided on the city record. Dahlgren was decided on the city record, plus evidence on the MERA claim admitted at trial. Because we conclude the Krmpotich claims fail even if the additional evidence is considered, we do not address the applicability to this appeal of *Swanson v. City of Bloomington,* 421 N.W.2d 307, 311–14 (Minn.1988), which sets out when a trial court may accept additional material evidence when reviewing a municipal body's decision.

## I. ACTIONS OF CITY COUNCIL

### Variance and Special Use Permit

■ This court reviews council and zoning authority decisions independently without according special deference to the district court. *See Swanson,* 421 N.W.2d at 311. Further,

a zoning or rezoning classification must be upheld unless opponents prove that the classification is unsupported by any rational basis related to promoting public health, safety, morals, or general welfare.

*Honn v. City of Coon Rapids,* 313 N.W.2d 409, 414–15 (Minn.1981) (quoting *State, by Rochester Ass'n of Neighborhoods v. City of Rochester,* 268 N.W.2d 885, 888 (Minn. 1978)).

Regardless of whether the zoning matter is legislative (rezoning) or quasi-judicial (variances and special-use permits), we determine whether the municipality's action in the particular case was reasonable.

*VanLandschoot v. City of Mendota Heights,* 336 N.W.2d 503, 508 (Minn.1983).

Under the Water Resource Management Ordinance (WRMO), "hardship" is a prerequisite to a variance. Duluth, Minn., Code § 51–35 (1987). "Hardship" refers to "the plight of the *landowner*" and conditions "not created by the *landowner.*" Duluth,

Minn., Code § 51–2 (1987) (emphasis added). Citing these WRMO provisions, the Krmpotich I plaintiffs contend the council improperly granted the wetlands variance and permit because Watson was an option holder, not a landowner. We disagree.

■ The WRMO does not define "landowner" and the term should not be construed so narrowly as to refer only to those holding record title to real estate. Watson, with a real interest in this action, does not seek an advisory opinion. The present owners knew of this action and could have joined in the action under Minn.R.Civ.P. 17.01. Had this happened, the evidence presented to the trial court would not have been any different. Under these circumstances, we find no prejudice in permitting the action to go forward in its present posture. *See Independent School Dist. No. 14 v. Ampro Corp.,* 361 N.W.2d 138, 144 (Minn.App.1985), *pet. for rev. denied* (Minn. Mar. 29, 1985) ("The purpose of the real party in interest rule is to protect defendants from facing multiple actions on a single claim by requiring that the party asserting the claim have such interest in it that a final decision will bar subsequent suits."). We also note that if Krmpotich I's argument were accepted, a variance applicant would be required to purchase the subject property before knowing whether the proposed development would be allowed. This would reduce the opportunity to pursue the development of marginal real estate.

■ Krmpotich I next argues that granting the wetlands variance and permit violated the WRMO standards which allow wetlands variances

only to the minimal extent necessary to give the applicant a reasonable use of said site and * * * only upon a showing of hardship.

Duluth, Minn., Code § 51–35(b) (1987). In resolution 89–0298, however, the council, consistent with the record, specifically found that the proposed development conformed with the requirements of section 51–35(b).

Similarly, the council also specifically addressed the requirements for a flood plain variance under WRMO § 51–24 (1987). The council findings are supported by the record. We also note that Krmpotich I's claim that there is no "hardship" under WRMO because the present owners are already making reasonable use of the property is perverse. Ready–Mix is presently discharging its damaging waste into the wetlands. We cannot say that the city's actions were unreasonable.

### Easements and Covenant

■ The platted part of the Watson development was subject to a restrictive covenant against filling, grading, or building within the area of "the drainage and utility easement." Duluth City Counsel resolution 89–0297 vacated "streets and utility easements" contained in the Maple Grove plat. The drainage easement was not explicitly vacated by this resolution. Krmpotich I contends the drainage easement and the related covenant, therefore, survived. The council has authority to vacate easements under Minn.Stat. § 462.358, subd. 7 (1988), which provides that a

> governing body of a municipality may vacate any publicly owned utility easement * * * which [is] not being used for sewer, *drainage*, electric * * * purposes.

(Emphasis added.) *See* Duluth City Charter ch. XIII, § 100 (1977). Here, the plan approved by the council would reroute the existing drainage system. As a result, the old easement would no longer be needed for drainage. We believe city council authority to vacate an "unused" easement includes authority to vacate an "unneeded" easement; thus, when the council vacated the street and utility easements here, it also, by implication, vacated the old, unneeded drainage easement and the associated covenant.

### Rezoning

■ Krmpotich I contends the findings in the council resolution 89–0299, granting Watson's request for commercial rezoning, violate the WRMO. We disagree. Our authority to review Duluth's discretionary decisions under its ordinances is restricted by *Honn's* rational basis test for reviewing zoning decisions. *See Honn,* 313 N.W.2d at 414–15. Here, consistent with its broad discretion on this record, the Duluth City Council ruled that the rezoning was allowable under WRMO. This ruling is not fatally deficient.

## II. REZONING ORDINANCES

■ The district court granted Dahlgren's motion invalidating the first rezoning ordinance, finding its reversionary clause an attempt to rezone without the proper procedural safeguards. Respondents raise by notice of review the argument that the district court should have severed the offensive reversionary clause, invalidating that clause, but upholding the rest of the ordinance. We agree. *See* Minn.Stat. § 645.20 (1988); *Upper Midwest Booksellers Ass'n v. City of Minneapolis,* 780 F.2d 1389, 1398–99 (8th Cir.1985) (unconstitutional provision of ordinance severed where remainder of provision was fully legally operative).

■ Krmpotich II challenges the validity of the second rezoning ordinance on procedural grounds, contending (1) that the council gave the public inadequate notice and opportunity for a hearing and (2) that the planning commission should have submitted a new study and report. *See* Minn. Stat. § 462.357, subds. 3, 4 (1988). In fact, a hearing was held on October 23, 1989, prior to the enactment of the second ordinance. Further, we cannot say that adoption of a new ordinance containing only the valid parts of a prior ordinance requires submission of a separate study. This was, in effect, a curative reenactment of a validly enacted ordinance. The reenactment is valid.

■ Krmpotich II additionally contends an insufficient number of affected property owners consented to the rezoning ordinance. While both Minn.Stat. § 462.357, subd. 5 (1988), and Duluth City Code § 50–117 (1961) require the consent of two-thirds of the "affected" real estate owners, they differ in defining the area affected and, thus, the number of consents required. Krmpotich II plaintiffs count consents un-

der the statutory method and arrive at 33 percent. The district court counted consents by the city code method and arrived at 71 percent. Because Duluth City Code § 50–117 was enacted in 1958, before the 1965 statute, the trial court's use of the ordinance was appropriate. *See* Minn.Stat. § 462.363 (1966) ("valid ordinances and regulations now in effect shall continue in effect"); Op.Atty.Gen., 441–H, Mar. 10, 1970.

### III. MINNESOTA ENVIRONMENTAL RIGHTS ACT

■ Under the Minnesota Environmental Rights Act (MERA):

[E]ach person is entitled by right to the protection, preservation, and enhancement of air, water, land, and other natural resources located within the state.

Minn.Stat. § 116B.01 (1988). Destruction or potential destruction of natural resources is a basis for a civil action against the offender. *See id.*

Under the statute:

Natural resources shall include, but not be limited to, all mineral, animal, botanical, air, water, land, timber, soil, quietude, recreational and historical resources.

Minn.Stat. § 116B.02, subd. 4 (1988).

The trial court's findings and conclusions in rejecting the MERA challenge parallel its approval of the Duluth City Council findings and conclusions when granting Watson's requests for relief from the Duluth Water Resources Management Ordinance, but our affirmance of the council's WRMO rulings does not dispose of the MERA claim. The MERA standards are independent of local ordinances. In a case involving the application of both local ordinances and MERA, the supreme court stated:

To some extent, the jurisdiction of the two forums overlaps, but neither forum excludes the other. Each acts within its own appropriate sphere and there is no conflict. Simply put, for the [property owner] to [use its property] it must be in compliance with the [local] zoning ordinance * * * and also be in compliance with the requirements of the Minnesota Environmental Rights Act.

*White Bear Rod & Gun Club v. City of Hugo*, 388 N.W.2d 739, 743 (Minn.1986) (footnote omitted). *White Bear*, 388 N.W.2d at 744, continued:

Conceivably, there may be situations where a landowner seeking a special use permit may be able to meet the criteria of one forum but not the other, but as stated, the landowner must pass muster in both forums.

Thus, our evaluation of the trial court's MERA ruling must be independent of our earlier WRMO determinations. *See* Minn. Stat. § 116B.12 (1988) (MERA remedies are in addition to other existing remedies).

■ The supreme court has stated:

[MERA] does not prescribe elaborate standards to guide trial courts, but allows a case-by-case determination by use of a balancing test, analogous to the one traditionally employed by courts of equity, where the utility of a defendant's conduct which interferes with and invades natural resources is weighed against the gravity of harm resulting from such an interference or invasion.

*Minnesota Public Interest Research Group v. White Bear Rod & Gun Club*, 257 N.W.2d 762, 782 (Minn.1977). This *Public Interest* balancing test under MERA may be divided into two parts. First, the trial court makes a determination of whether natural resources will be affected. If so, the trial court then must balance the utility of the actions against the damage to the environment. *See County of Freeborn v. Bryson*, 297 Minn. 218, 227–29, 210 N.W.2d 290, 297 (1973). Further,

[t]he question to be determined by [an appellate court] is whether the trial court's findings of fact are clearly erroneous. Under the clearly erroneous rule findings of fact by the district court may be set aside only if [the appellate court] on the entire evidence is left with the definite and firm conviction that a mistake has been made.

*Public Interest*, 257 N.W.2d at 782–83.

The trial court here found:

[T]he operation of the proposed * * * commercial mall on the Watson property will, for the reasons stated herein, have no consequential effect on natural resources, natural environment, animal, botanical or water resources, which are located on or off the Watson property.

The trial court concluded:

> The alleged steep rocky cliffs, the wetlands, the alleged "Coffee Creek" to be channelized on the Watson property (referred to collectively as the "alleged natural resources") in question are not a natural resource within the meaning of Minnesota Statutes 116B.02 Subd. 4.

■ We cannot accept the writing off of these wetlands and the other natural resource aspects of this site. Therefore, we reject the trial court's ultimate conclusion that MERA will not be violated. We believe it was clearly erroneous for the court to deny the environmental value of the Watson site, particularly the wetlands.

Wetlands typically benefit people indirectly. For this reason wetlands traditionally have not enjoyed the attention accorded other environmental interests, such as tillable land, surface water, forests, prairie, and air. Even unseen underground water was embraced more quickly than wetlands. Swamps may have been, until recently, the "discrete and insular minority" among environmental resources.

Now, however, the important relationship between wetlands and the quality of life has been recognized at both the state and federal levels. *See, e.g.,* Minn.Stat. § 103A.202 (1990) ("The legislature finds that it is in the public interest to preserve the wetlands of the state * * *."); 16 U.S.C.A. § 3901(a)(1) (West 1986) ("wetlands play an integral role in maintaining the quality of life through material contributions * * * to the health, safety, recreation, and economic well-being of all our citizens of the Nation"). Further, Congress has explicitly identified the problem of disappearing wetlands:

> [W]etlands constitute only a small percentage of the land area of the United States, [and] are estimated to have been reduced by half in the contiguous States since the founding of our Nation, and continue to disappear by hundreds of thousands of acres each year.

16 U.S.C.A. § 3901(a)(7) (West 1986).

The Minnesota Supreme Court, implicitly empowering courts to address this problem, has endorsed the state's strong policy of protecting wetlands. *See Bryson,* 297 Minn. at 219, 226–27, 210 N.W.2d at 292, 296 (MERA limits power of condemnation of wetland). Finally, by enacting the "Wetland Conservation Act of 1991," the state legislature has recently articulated the wetlands protection policy implicit in *Bryson's* application of MERA:

> The legislature finds that the wetlands of Minnesota provide public value * * * and that it is in the public interest to:
>
> (1) achieve no net loss in the quantity, quality, and biological diversity of Minnesota's existing wetlands;
>
> (2) increase the quantity, quality, and biological diversity of Minnesota's wetlands by restoring or enhancing diminished or drained wetlands;
>
> (3) avoid direct or indirect impacts from activities that destroy or diminish the quantity, quality, and biological diversity of wetlands; and
>
> (4) replace wetland values where avoidance of activity is not feasible and prudent.

1991 Minn.Laws ch. 354, art 1, § 2 (to be codified at Minn.Stat. § 103A.201, subd. 2(b) (Supp.1991)).[2]

Noting the strength of state and federal policies protecting wetlands, we conclude the trial court erred in the first step of the MERA analysis. This development would, in fact, destroy an important environmental resource.

Our conclusion takes account of the proposed mitigation ponds. They are designed for flood control and aesthetics. That is not enough. There is a special, inherent ecological value in wetlands, which value is different from the ecological value associated with holding ponds or any other open

---

2. This act was adopted after the trial court decision in this case.

water. The natural wetland value will be permanently lost if the Watson development proceeds. The mitigation ponds designed to substitute for the wetlands under the Watson plan are a qualitatively different type of resource. While this type of substitution, rather than replacement, is not forbidden by MERA, the trial court made no findings addressing the effect of replacing the existing wetland resource with man-made "mitigation ponds" and the expert testimony was that the ponds would not serve the purpose of a wetland.

The trial court ruling on the nonexistence of natural resources is based in part on the court's conclusion that this wetland has been so substantially degraded that it is no longer a natural resource under MERA. This is inconsistent with expert testimony that, given relief from the regular input of pollutants, the area could purge itself and recover. To refuse to consider the reasonable potential of land rehabilitation would reward landowners and operators who, either by violating existing pollution control standards or otherwise, poison their lands out of the category of "natural resources" and into the more profitable category of developable commercial or industrial real estate. Such a policy is inconsistent with MERA's statement of intent to protect all natural resources. *See* Minn.Stat. § 116B.01; *see also* Minn.Stat. § 116B.02, subd. 4. It would eviscerate the statute.

■ We also note that scenic and aesthetic resources of government-owned land are a legitimate MERA consideration. *See State by Drabik v. Martz,* 451 N.W.2d 893, 896–97 (Minn.App.1990) (this court affirmed issuance of a temporary injunction against construction of a radio tower because of effect it would have on view from surrounding BWCA lands), *pet. for rev. denied* (Minn. April 25, 1990). Here, there are public roads passing within sight of this wetland, creek, and wooded slope. To replace wetland and trees and creek with a retail mall is not an aesthetic improvement—not as we understand things in 1991.

■ To the extent a proposed development would alter an area, the degree of alteration (or gravity of the associated harm) should be balanced in the *Public Interest* test. Here, the steep slopes would by dynamited and cut back 28 to 40 feet. Also, 1.85 acres of wetlands would be covered with 20 to 28 feet of fill; the equivalent of 22,000 to 32,000 ten-cubic-yard truckloads would be moved. These changes would be most grave; from sloping hill, swamp, and creek to flat, dry, buildable terrace. We are convinced the trial court's calculus gives an improper weight to the degree of environmental change required by the proposed development. While this wetland may recover from its present degraded condition, it will never recover if converted to a strip mall.

■ We also note that the trial court concluded that Watson met its burden of proving an affirmative defense. *See* Minn. Stat. § 116B.04 (1988). Because there was no evidence, however, that Watson investigated other nearby development sites or considered scaling down or changing its plans to conform to the environmental needs of the area, the trial court's finding is not supported by the record.

■ MERA expresses a "paramount" concern for the preservation of natural resources. *See* Minn.Stat. § 116B.09, subd. 2 (1988). The supreme court has specifically concluded that this means "superior to all other[ ] [concerns]." *Floodwood–Fine Lakes Citizens Group v. Minnesota Environmental Quality Council,* 287 N.W.2d 390, 399 (Minn.1979). Thus, the balancing must be done with significant emphasis on saving the environment.

Finally, Minn.Stat. § 116B.04 (1988) provides:

Economic considerations alone shall not constitute a defense [under MERA].

The developer desires to create retail property. Its motive of profit is legitimate, but wholly economic. Under MERA an economic goal, no matter how admirable, does not alone justify the destruction of natural resources.

In view of the trial court's erroneous assessment of MERA requirements and its dubious balancing of the various interests,

we hold that the *Public Interest* balancing process was inappropriately applied and the conclusion that the Watson development would not violate MERA was clearly erroneous.

**DECISION**

We affirm the trial court by denying relief to the Krmpotich appellants on their appeal of the city council actions granting variances, rezoning, and vacating an easement. We modify the trial court judgment by severing the reversionary clause from ordinance 8921, which is otherwise valid. We reverse the trial court on the Dahlgren environmental claim by holding that the Watson development would violate the Minnesota Environmental Rights Act.

Affirmed in part and reversed in part.